1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF OREGON

3                  PORTLAND DIVISION

4

5

      UNITED STATES OF AMERICA,          )
6                                        )
                        Plaintiff,       )   Case No.
7                                        )   3:19-cr-00458-MO
             v.                          )
8                                        )   July 14, 2021
      JOHNL JACKSON,                     )
9                                        )   Portland, Oregon
                        Defendant.       )
10

11

12

13              **TRANSCRIPT OF PROCEEDINGS**

14                  (Motion to Compel)

15

16       BEFORE THE HONORABLE MICHAEL W. MOSMAN

17          UNITED STATES DISTRICT COURT JUDGE

18

19

20

21

22

23    **COURT REPORTER:**
24    Kellie M. Humiston, RMR, CRR
      (503) 326-8186
25    Kellie_Humiston@ord.uscourts.gov

1          **A P P E A R A N C E S**

2

3     FOR THE PLAINTIFF:

4                              UNITED STATES ATTORNEY'S OFFICE
                               By:  Kelly Alexandre Zusman
5                              1000 SW Third Avenue
                               Suite 600
6                              Portland, OR 97204

7     FOR THE PLAINTIFF:

8                              UNITED STATES ATTORNEY'S OFFICE
                               By:  Pamela Paaso
9                              1000 SW Third Avenue
                               Suite 600
10                             Portland, OR 97204

11
      FOR THE DEFENDANT:
12
                               HOEVET OLSON HOWES
13                             By:  Celia A. Howes
                               1000 SW Broadway
14                             Suite 1740
                               Portland, OR 97205

15

16    FOR THE DEFENDANT:

17                             HOEVET OLSON HOWES
                               By:  Per C. Olson
18                             1000 SW Broadway
                               Suite 1740
19                             Portland, OR 97205

20

21

22

23

24

25

<pre>
 1              (July 14, 2021, 10:40 a.m.)
 2                  P R O C E E D I N G S
 3
 4         MS. ZUSMAN:  Your Honor, Kelly Zusman appearing on
 5    behalf of the United States.  This is United States v. Jackson,
 6    Criminal No. 3:19-cr-00458-MO.  Appearing today with Pam Paaso.
 7         Defendant is here represented by Miss Howse, and we're
 8    here on defendant's motion to compel and to dismiss.
 9         THE COURT:  Thank you.  Good morning.
10         MS. HOWES:  Good morning, Your Honor.  We are here on
11    an oral argument on the defendant's motion to compel.  It is my
12    understanding that oral argument on defendant's motions to
13    dismiss is scheduled for August 30th.  I am prepared to discuss
14    the standards that apply to those motions to the extent that they
15    provide context for the Court's decisions here today, but our
16    focus is on Mr. Jackson's requests for discovery.
17         THE COURT:  Thank you.  You can go ahead and be seated.
18    And thank you for your habit of standing, but I'm going to ask
19    you to stay seated during the hearing so I can hear you a little
20    better through the Plexiglass.
21         So that's right.  The issues are intertwined, but today
22    we are only talking about the motion to compel.  It'll be
23    necessary to understand the motions to dismiss, to understand
24    what's being sought, why it's being sought, and why it might be
25    relevant, but I'm not going to resolve the motions to dismiss
</pre>

1  today.

2          Let me give you some tentative thoughts that I think

3  might help get us started, and then I'll start with oral

4  argument.

5          Does anyone have the intention of putting on evidence

6  other than argument for this case, for this hearing today?

7          MS. HOWES:  Not today for the defense.

8          MS. ZUSMAN:  We do not, Your Honor.

9          THE COURT:  All right.  So Mr. Jackson has filed

10 several motions to dismiss, specifically to -- that it was a

11 violation of the Speedy Trial Act to dismiss -- to charge,

12 dismiss, and then recharge Count -- we'll call it Count 5;

13 second, that there -- that it is an unconstitutional delay

14 separate from the Speedy Trial Act issue to bring the charges in

15 the superseding indictment, that that whole thing took too long

16 and was for improper reasons; and third, that under *Youngblood*,

17 that something should happen, dismissal or perhaps other

18 remedies, for the failure to preserve or acquire the cellphone

19 records from MV5.

20         Those are your three motions?

21         MS. HOWES:  Yes.

22         THE COURT:  What I'd like to do is make sure that I

23 have the governing methodology right first.  So the simplest one,

24 just -- not for its answer, but for its methodology, might be the

25 cellphone records, because there is a methodology laid out in

1 *Arizona v. Youngblood*, and that methodology is essentially two

2 parts: one -- so I'm going to assume, I think the government

3 hasn't disagreed, I don't think either side has disagreed that

4 the governing standard is from *Youngblood* even though

5 *Youngblood's* about failure to preserve evidence, and here it's --

6 I suppose there's sort of an inferential way it could be thought

7 of failure to preserve, but it's really the failure to allow for

8 the opportunity for the defense to acquire, for the government to

9 acquire.

10       Does anybody disagree that despite that factual

11 difference, the general standard for *Youngblood* is the governing

12 standard here?

13       MS. HOWES: No disagreement.

14       MS. ZUSMAN: No, Your Honor.

15       THE COURT: Two parts to that standard: one is some

16 sort of bad faith in the failure; and two, that -- some idea that

17 it could have affected the outcome. So that's -- in fact, I

18 think what I'll do is just break this up into pieces and start

19 with that. What I said, though, I'd like to do is get the

20 methodology right. I think that's the methodology. The burden

21 ends up initially at least being on the defendant to propound

22 something that suggests bad faith at least to go forward and to

23 explain how the evidence could affect the outcome here.

24       What have you got on bad faith for failure to acquire

25 these records? If you'd remain seated, I'd appreciate it.

1    MS. HOWES:  I'm sorry.  I forgot.

2    THE COURT:  That's fine.

3    MS. HOWES:  I will answer the question of the Court,

4 but I will also suggest that because the standards and the

5 methodology for the motions to dismiss based on unconstitutional

6 delay and with regard to the Rule 48 dismissal order are lower

7 than *Youngblood* and because the evidence I'm seeking is also

8 relevant to those motions, I believe my threshold for acquiring

9 discovery of the materials and information I seek is lower than

10 that set forth in *Youngblood*.  And so you're right that

11 *Youngblood* requires bad faith.

12    THE COURT:  Let's start with this one.  And, actually,

13 before I finish on methodology, the one question is, I've

14 outlined a methodology for resolving your motion to dismiss, but

15 I haven't outlined the methodology for resolving your motion to

16 compel, which may have something else I need to think about in

17 terms of granting it even on just the bare *Youngblood* issue in

18 your third motion to dismiss.

19    Is there something else I should think about in terms

20 of what the right test is, not for your motion to dismiss, but

21 for your motion to compel?

22    MS. HOWES:  Well, the -- all of the items that we seek,

23 I believe, require production under *Brady* and its progeny.  And

24 the standard, the articulation of *Brady* that I think is most

25 helpful to our cause is that set forth by the Supreme Court in

1    *Kyles v. Whitley*, which says that *Brady* requires that the

2    defendant receive the information that is necessary to instill

3    confidence that he has received a fair procedure here, a fair

4    outcome at his dispositive motions, and a fair outcome at trial.

5            And so I think --

6            THE COURT:  That's a little -- that's a little tricky

7    to apply for a *Youngblood* case, though, right, because by

8    definition, a motion under *Youngblood* is a motion for stuff that

9    cannot be produced anymore.  So there aren't cellphone -- I mean,

10   it would be simple if I just tell them to produce them, but now

11   we're dealing with the question what to do about the fact that

12   they no longer exist.

13           MS. HOWES:  Well, except that I think that the question

14   for the Court under the *Youngblood* analysis is the extent of the

15   government's culpability for the loss of evidence, and so I

16   should be entitled to the determination of that issue to discover

17   the information relevant to that question.

18           THE COURT:  In other words, that although the actual

19   cellphone records can't be produced, you want any evidence

20   that -- you want for production any evidence under *Brady* at a

21   minimum that might suggest bad reasons for not acquiring this

22   evidence in the first place?

23           MS. HOWES:  Correct.

24           THE COURT:  In other words, internal documents.

25           MS. HOWES:  That's right.

1    THE COURT:  And you agree that what *Brady* would require

2  for that, then, is that the government, at a minimum, look for

3  and produce anything in its internal files that would suggest an

4  inadequate rationale for not acquiring the cellphone records?

5    MS. HOWES:  That's right.  Specifically I'm asking for

6  internal communications within the U.S. Attorney's Office and

7  with their investigation team that is -- that are specific to

8  investigatory leads and determinations as to whether to interact

9  with MV5 over the course of the government's investigation, and

10  those same materials as relevant to the government's decision to

11  file the motion to dismiss Count 6 with respect to the previous

12  indictment when it did.

13    THE COURT:  I know those all overlap, but I want to

14  stick with the cellphone records for just a second.

15    MS. HOWES:  Sure.

16    THE COURT:  And I'm not trying to suggest that I won't

17  eventually hear how they all overlap, but let's stick with this

18  one just for an initial piece.

19    So what you want -- in a typical case, then, I would

20  verify if the government agrees that that's a *Brady* obligation it

21  has and send them out to take a look at their internal files and

22  produce anything that fits this *Brady* obligation.

23    You're today asking for something more than that,

24  aren't you?  You're suggesting, or at least it seems you're

25  suggesting, that I should skip that step because of the

1   government's inadequate performance under *Brady* and just have the

2   whole file turned over to you, or am I wrong about that?

3       MS. HOWES:  You're right about that.  We have

4   essentially lost faith that the government is parsing through its

5   information with the same lens that we would.  And we have

6   observed over the course of this case that the government has

7   made different judgment calls as to certain evidence than we

8   would make.  And I would like the Court to relieve the government

9   of its burden to go through that process, and give it to us.

10      THE COURT:  All right.  Thank you.

11      So that's two parts.  The first part is do you agree

12  that you have an obligation to look at your internal files under

13  *Brady* to see whether there is evidence that would support a

14  defense motion under *Youngblood*, that is, a defense motion that

15  would say that you failed to acquire the cellphone records for --

16  in bad faith; that if there were such in your internal files, do

17  you agree you should look for and produce it if it exists under

18  *Brady.*

19      MS. ZUSMAN:  Yes.  And let me answer this carefully.

20  First, I disagree with the proposition that *Brady* as a doctrine

21  necessarily applies to a motion to dismiss, particularly insofar

22  as it relates to our own internal charging decisions.  And for

23  that, I would refer the Court to the *Armstrong* case from the

24  Supreme Court, and that's 517 U.S. 456, and that was from 1996,

25  where the Supreme Court recognized that internal charging is of a

1    different species, if you will, than other discovery.  It really

2    doesn't relate to the merits of the case so much as how the

3    government does its business.  And for that, it requires more

4    than simply, "We don't trust the government and we want that

5    information."

6            THE COURT:  I'll pause you there for just a moment.

7    You advanced two ideas, one general and one specific.  The

8    general one is that you're not sure that *Brady* applies to motions

9    to dismiss generally speaking, not just ones that get at internal

10   documents with motions to dismiss.

11           Is that specific to motions to dismiss?  Do you agree

12   it applies to some pretrial motions?

13           MS. ZUSMAN:  I absolutely agree that the Ninth Circuit

14   has held it applies to motions to suppress.

15           THE COURT:  How do you distinguish *Brady*'s application

16   to motions to suppress from, say, motions for unconstitutional

17   delay in indictment?

18           MS. ZUSMAN:  Right.  And, again, I'm carving out here

19   specifically motions that address the government's charging

20   decisions, and so motions to dismiss that are premised on the

21   idea that we are -- we shouldn't be bringing the charge at all,

22   that we have somehow -- were flawed in bringing the case

23   altogether, whether it's for an unconstitutional reason, a

24   selective prosecution reason, what have you.

25           THE COURT:  Why would *Brady* apply to motions to

1    suppress but not apply to the setting you're carving out?

2         MS. ZUSMAN:  Because *Brady* -- really the heart of *Brady*

3    is exculpatory information, which means Mr. Jackson is not

4    guilty, and that can be information that directly undermines an

5    element of the charge or that bolsters an aspect of a defense,

6    and it also has been extended to include impeaching information

7    for government witnesses.

8         It has been classically treated as a trial right.  The

9    Ninth Circuit has extended that to motions to suppress, which

10   involve evidentiary issues, that require often witnesses to --

11        THE COURT:  I guess I read that is whatever the core

12   may once have been of *Brady*, it now has another core in the sense

13   that it's a holding I must follow that may have nothing to do

14   with guilt or innocence, or it may have something to do with a

15   prophylactic measure under *Miranda*, for example, or something

16   like that --

17        MS. ZUSMAN:  Correct.

18        THE COURT:  -- and yet *Brady* applies to anything the

19   government has in its possession that might support the

20   defendant's motion to suppress, right?

21        MS. ZUSMAN:  To support the motion -- that's correct.

22   But, again --

23        THE COURT:  I mean, if the reason that you would treat

24   motions to dismiss indictments different than motions to suppress

25   is that the core of *Brady* is that it's a trial right about guilt

1   or innocence, then you fail to explain why I should care about
2   motions to suppress, but I have to.
3          MS. ZUSMAN:  Right.  And, again, I'm getting a little
4   far afield in terms of where I thought we were headed, but
5   motions to suppress really relate to what evidence can come in at
6   trial.  So I see it as really a corollary to the trial right
7   insofar as it relates to what evidence is going to be admissible
8   at trial.
9          The motions to dismiss, and several of the motions to
10  dismiss that have been filed here, really are directed against,
11  "Government, why have you brought this case altogether," and for
12  that, I think just slapping *Brady* onto it is an ill fit in large
13  part because the Supreme Court in *Armstrong* recognized that
14  there's another constitutional principle at play, and that's
15  separation of powers.
16         THE COURT:  So the impact is, to take it to its
17  application in this case, of your argument would be that if in
18  your file there were internal documents supporting the idea that
19  a TFO deliberately didn't acquire cellphone records out of a
20  concern that it might be bad for your case until the cellphone
21  records had been deleted off the system, and then moved forward
22  afterwards, that you would have no *Brady* obligation or any other
23  obligation to disclose that evidence.  That's -- that's the
24  impact of this case, right?
25         MS. ZUSMAN:  No.  And again to be clear, my position

1    would be that if we possessed information that Detective Lee

2    deliberately avoided contacting Minor Victim 5 and he did so

3    because he knew the clock was running on her cellphone

4    geolocation data, I think that does at least potentially raise

5    due process concerns, and I think none of -- none of us would

6    have any compunction about turning over that information if we

7    had it.

8            Now, I understand Mr. Jackson's motion, however, to be

9    broader than that.  He's not asking us to just produce

10    information that either Detective Lee or any other member of the

11    prosecution team deliberately avoided reaching out to MV5 in

12    order to lose this geolocation information, because if that were

13    the essence of the motion, then I'd have no trouble standing here

14    and saying we don't have that.  I don't have that smoking gun.

15            But her motion says, we don't trust the government, so

16    you should turn over all of your information, all of your

17    e-mails, every communication.

18            THE COURT:  So I can take this in two pieces, which is

19    what her argument was.  The first piece is is there any

20    obligation -- we started this by first that there is an

21    obligation to look for *Brady* by the government, and then, second,

22    that if there is such an obligation, that the defense mistrusts

23    the government's ability to do that right, so skip the step I'd

24    normally take.

25            So my first question was simply, do you agree that

1   there is this obligation?

2         My next question is going to be, do you agree I should

3   skip over the government out of a failure of performance and just

4   turn it over to some other step?

5         I take it that your answer to the first question,

6   although I thought it was going a different direction, is yes,

7   either under *Brady* or under the due process clause, that the kind

8   of information that we've discussed, something that would

9   actually support a motion under *Youngblood*, support the idea of

10  bad faith failure to acquire cellphone records, you feel that if

11  you saw it or looked for it and saw it, you'd have to produce it,

12  correct?

13        MS. ZUSMAN:  I think that's correct, yes.

14        THE COURT:  And that's true even if the information

15  wasn't in external evidence, but it's in internal communications

16  among the prosecution team, correct?

17        MS. ZUSMAN:  Correct.

18        THE COURT:  All right.  So with that, normally what I

19  would do is say either, "Have you done the search that the

20  obligation would require of you," or "Go and do it and tell me

21  what you learn."

22        The second argument is that the government's

23  performance so far under *Brady*, according to Mr. Jackson, has

24  been inadequate enough that I ought to skip that step and take

25  some other action.  What's your response to that?

1        MS. ZUSMAN:  So my response to the first part of your

2    question is that we have spoken with Detective Lee, who I think

3    is our operative player here, and he has through his declaration

4    told you affirmatively that there was no intentional delay in

5    contacting Minor Victim 5; that, in fact, he knew she was

6    skittish; he was concerned about approaching her; he knew that

7    she had evaded talking to law enforcement in the past; and that

8    based on his extensive experience, he knows that sex trafficking

9    victims, particularly young girls like MV5, are difficult

10   witnesses at best, and that he didn't want to push her too fast,

11   too hard, too quickly.  And that's really the reason that he took

12   the time that he did in order to find her and then eventually

13   reach out to her.  It had nothing to do with her geolocation

14   data.

15       I think it's also -- when you're looking at that, it's

16   important to note that he didn't know that she was going to say

17   that Jackson took her phone until after that one-year

18   preservation period expired.  His meeting with her was in October

19   of 2019.  And as Mr. Jackson has told you in their briefing

20   material, the expiration dates for that geolocation data was

21   September 8th of 2019, so almost a month before.

22       THE COURT:  Well, I understand that that's the

23   government's position about what has happened with the failure to

24   acquire cellphone data.

25       The argument you're facing, not to put too fine a point

1   on it, is that there -- that that process of the government

2   looking for *Brady* and then announcing that it has or has not

3   found anything *Brady* and has a legitimate explanation that should

4   control is what normally happens most of the time, but that in

5   this case, the government has forfeited that level of trust, at

6   least vis-a-vis the defense, and that I should intervene in such

7   a way that doesn't require the defense to simply accept that

8   explanation of what the files might show.

9         What's your response to that?

10         MS. ZUSMAN:  And as I understand it, the defense has

11   two primary complaints with how the government has handled what

12   it considers *Brady*.  The first is Priscilla Seaborg's e-mail, and

13   it -- regarding the meeting with her client and before, and it

14   took us nine months to produce that.

15         The second is the Keonte Scott proffer.  That took

16   place in February of 2020.  We did not receive the report of that

17   interview from Detective Lee until the first part of January

18   2021, so there was an 11-month delay in producing the report.  As

19   soon as we received it, we turned it around and got it to the

20   defense within a couple of weeks.

21         So if I understand it correctly, those are their --

22   their two primary data points in urging you to say, "I don't

23   trust the government anymore.  I've got to let you go in there

24   and rummage through all of their files."

25         With those two points, I will say that I agree with

1    Miss Howse that those are exculpatory.  I agree that they should

2    have been turned over more promptly than they were.

3          As a result of really the defense bringing this to our

4    office's attention, that's what prompted us to do a complete

5    top-to-bottom audit of the discovery in this case.

6          We now, as of last month, have produced 11 volumes of

7    discovery, and those two items that she mentions have been

8    produced, and we're still 5 months away from trial.

9          So that's by -- let me -- if I can sum it up this way:

10    I recognize that we have not been as quick in producing this

11    information as we should have been.  We have corrected it.  We

12    have self-corrected, and therefore, obviated the need for either

13    the Court or the defense to step into our shoes and go through

14    our own internal files.

15          THE COURT:  Thank you very much.

16          Your response.

17          MS. HOWES:  To all of it or just that last point?

18          THE COURT:  Well, we're in agreement that there's a

19    *Brady* obligation to disclose what I'll use as a shorthand, bad

20    faith information that might be found even in internal documents.

21          MS. HOWES:  Okay.

22          THE COURT:  And the government's answer to whether that

23    exists or not, the normal pathway for handling such things is

24    that it has done a careful look, including recently, and there is

25    nothing that would support a bad faith showing under *Youngblood*.

1    And then the last step is the only one you need to

2    respond to, because the rest we're agreed upon, and that is, has

3    the government's overarching performance under *Brady* meant that

4    you're entitled not to be forced to rely on the government's

5    review and explanation about what is or isn't in the file.  So

6    the last part.

7        MS. HOWES:  To that question, we are not yet satisfied

8    that the government has regained our trust in culling through the

9    relevant materials and information to answer our requests and our

10   questions directly, specifically, and thoroughly.

11       THE COURT:  Is that -- is the mistrust you've expressed

12   grounded in those two data points or is there more than that?

13       MS. HOWES:  There -- those two data points, plus what I

14   perceive to be some red herrings buried in their response to our

15   motion to compel.  The government -- the answers the government

16   has given the Court in its response with respect to the

17   cellphone, I find misleading.  And the complaints we raised

18   regarding the loss of the cellphone, the government answers those

19   concerns by referring to a cellphone that was used and destroyed

20   weeks before MV5 ever came into contact with Mr. Jackson.

21       In my review of the materials that have been produced,

22   I have yet to see a report where the government is asking MV5

23   about the relevant telephone.

24       The government's answers as to other points in the

25   response, I find equally as concerning and disappointing, but

1   they're not relevant to the question about the cellphone

2   evidence.

3         I think because we're talking about the cellphone

4   evidence and because their answer to that, I -- and the response,

5   I found, was misleading, my concerns are not alleviated, they

6   persist, and that is -- in compilation with other representations

7   the government has made over the course of this case, including

8   oral representations that were memorialized in e-mails to me

9   characterizing the nature of the information that they had

10   through Keonte Scott's proffer and through MV4, as not helpful to

11   Mr. Jackson.

12         Now, whether they had a piece of paper in their hand or

13   not to provide to me is a different question.  They had that

14   information in hand, whether it be written down or not, and the

15   *Brady* requirements extend to information the government knows,

16   not just written reports.

17         THE COURT:  All right.  Thank you.

18         I want to move on to the other motion to dismiss, and

19   the one grounded in the charge, dismissal, and recharge, which is

20   said to be, or at least labeled as a violation of the Speedy

21   Trial Act.

22         So tell me more specifically in what way you view that

23   scenario as violating the Speedy Trial Act?  I think I understand

24   your third motion better.  That's an unconstitutional delay in

25   bringing the last indictment, but this one, I guess the Rule 48

1  question, how is that a violation of the Speedy Trial Act?

2          MS. HOWES:  It -- the argument is best made in

3  understanding the context in which the government dismissed -- or

4  moved the Court to dismiss the first indictment.

5          THE COURT:  So I understand your argument that that was

6  improper, that there weren't actually adequate grounds at the

7  time the motion was made to justify granting it; that had they

8  been pressed, they wouldn't have had support for the assertions

9  they made seeking a motion to dismiss without prejudice.

10          If that's all that had happened, what would the remedy

11  for that be?  Someone got a charge dismissed without prejudice,

12  you later learned that that was inadequate, therefore what?

13          MS. HOWES:  Well, the *Wallace* case that we cited in our

14  reply tells the Court that if the Court learns after granting a

15  government's motion to dismiss without prejudice that the

16  government's basis for that motion was a sham, the Court can

17  revisit its decision and enter that order with prejudice.

18          THE COURT:  All right.  So then what does happen, of

19  course, is charge, dismissal, recharge.  And in what way does

20  that violate the Speedy Trial Act?

21          MS. HOWES:  The speedy trial clock is tolled in between

22  the dismissal and the recharge.  And I -- I honestly --

23          THE COURT:  That's not my question.  If it's not

24  tolled, is there sort of a numerical violation to the Speedy

25  Trial Act?

1          MS. HOWES:  I believe I set forth an argument for

2     numerical violation.  So there were a certain number of days that

3     had passed leading up until the dismissal of the case.  It

4     appeared as if the Court was about to grant Mr. Jackson his

5     request for a speedy trial, case was dismissed, there was some

6     lapse of time, a matter of weeks, perhaps, and then there was a

7     recharge.

8          And in the span of that time, up until Mr. Jackson

9     appeared, I think he made his first appearance on the case, the

10    clock had tolled and there was --

11         THE COURT:  The clock had tolled or run?

12         MS. HOWES:  Run.  Excuse me.  Run.

13         THE COURT:  That's in your argument.  I wasn't clear

14    from your briefing if you had that numerical argument.  Is

15    that --

16         MS. HOWES:  I believe I did have a numerical argument.

17    And I can pull my briefing up here.

18         THE COURT:  Let's just come back to that.

19         MS. HOWES:  Okay.

20         THE COURT:  So that is your argument and that's -- and

21    therefore, the remedy you're seeking for the -- for the improper

22    dismissal without prejudice is dismissal under the Speedy Trial

23    Act?

24         MS. HOWES:  Correct.  There are two requests I'm making

25    under that motion.  I apologize for confusing the Court.  But one

1  argument is that the Court can revisit its order dismissing

2  without prejudice Count 6 of the original indictment based on

3  what appeared to be misrepresentations to the Court about the

4  reasons for its motion.

5         The second argument --

6         THE COURT:  Well, you know, it's not a day to mince

7  words.  So you contend they are misrepresentations, right?

8         MS. HOWSE:  Fair enough.  Yes.  I don't have

9  information that suggests those were not misrepresentations, so

10 let's just call them misrepresentations.

11        THE COURT:  Well, certainly you contend they're

12 factually incorrect.

13        MS. HOWES:  Yes.

14        THE COURT:  All right.  Both of them?

15        MS. HOWES:  Both of them.

16        THE COURT:  All right.  So now we're not here on your

17 motion to dismiss for speedy trial violation, we're here on a

18 motion to compel.

19        MS. HOWES:  Correct.

20        THE COURT:  And you appear to have, and have written

21 up, the argument based on information that you used to

22 demonstrate in your view that the assertions are factually

23 incorrect and couldn't have justified a motion to dismiss without

24 prejudice.

25        MS. HOWES:  Correct.

1          THE COURT:  What more are you seeking by way of a

2    motion to compel to support that argument, the speedy trial

3    argument?

4          MS. HOWES:  Well, perhaps you're seeing what I am,

5    which is I believe I have sufficient evidence to argue my motion

6    to dismiss based on the apparent misrepresentations in the

7    government's pleading.

8          THE COURT:  Your contention -- your argument, at least

9    as you briefed it, doesn't require on this argument, the speedy

10   trial argument, any showing of bad faith, right?

11         MS. HOWES:  My argument on the speedy trial violation,

12   I do not believe, requires any showing of bad faith.  It's purely

13   a --

14         THE COURT:  The time ran, it ran, and you don't have to

15   show bad faith.

16         MS. HOWES:  The time elapsed.

17         THE COURT:  It may have something to do with the

18   remedy, but not the violation.

19         MS. HOWES:  And I think here I've cited a case, Your

20   Honor, the *United States v. Biggs*:  Based on the facts now known

21   to defendant and the court about the reasons for the delay, the

22   court can make a finding that because the delay was not motivated

23   by proper consideration, the time should have been excluded from

24   the Speedy Trial Act calculation.

25            So I think there is some consideration there that the

1  Court can evaluate the government's reasons for the delay and

2  determine that there -- that there were proper reasons to exclude

3  the --

4         THE COURT:  So the same with the Rule 48 problem, that

5  you don't -- your argument, as I understand it, doesn't hinge on

6  showing the government willfully misrepresented its underpinnings

7  for the motion.  If they were just sloppy about it and wrong,

8  then you have the same argument, don't you?

9         MS. HOWES:  That's correct.

10         THE COURT:  All right.  Thank you.

11         I first want to understand, even though we're not

12  resolving it today, what the governing standard is for the speedy

13  trial motion, because that will tell me what's relevant to be

14  produced or not.

15         So the argument is, first of all, that -- that if

16  Miss Howse is right and the initial motion to dismiss without

17  prejudice was founded on erroneous assertions, assertions that

18  couldn't have been backed up on the day they were made, that that

19  results in no tolling of the time between the granting of that

20  motion and his appearance on the second indictment.

21         Do you agree or disagree?

22         MS. ZUSMAN:  And I wasn't prepared to address the

23  Speedy Trial Act motion.  I think our response to that is due on

24  the 20th, Your Honor.

25         THE COURT:  The reason I'm bringing it up now is that I

1   need to decide what needs to be produced to argue that motion,

2   and that has to be decided today.

3          MS. ZUSMAN:  It -- I guess in terms of focusing on the

4   reasons for the initial dismissal, it's my understanding that

5   that requires a showing of not just making a mistake, but bad

6   faith.  And the case example comes from the prosecutor who

7   doesn't like the looks of the jury, and moves to dismiss.  And

8   that's offered as -- that's a bad faith reason for dismissing an

9   indictment.

10         Now, the reasons that we gave on September 28th of 2019

11   for dismissing the indictment, and I understand that Mr. Jackson

12   has really parsed those comments, but I would describe that as we

13   have an ongoing investigation.  And if you just focus in on what

14   was happening right around the time of that dismissal, it was the

15   day before September 26th that Detective Hollan and Detective Lee

16   had arranged to meet with MV5.  They had --

17         THE COURT:  I'm going to stop you there.  I'm aware of

18   the background.  And I don't view it as parsing the statements.

19   I view it as just analyzing them.

20         But first, you know, not to beat the same refrain over

21   and over again, but I want to make sure I understand what the

22   governing standard is for, as you put it in your brief, to upset

23   a court's Rule 48(a) dismissal without prejudice, you contend

24   that the defendant must overcome the presumption that the

25   government acted in good faith.  And that's been the subject of a

 1    counterargument in a reply brief.  You cite *Wallace*.

 2            What's -- I guess I'm asking, what's your response to

 3    the reply brief on this subject?

 4            MS. ZUSMAN:  Yes.  And I understand that *Wallace* refers

 5    to a presumption, but it doesn't include that specific language.

 6    But there is another Ninth Circuit case, and I'm quoting, it says

 7    that when the Court considers --

 8            THE COURT:  What case?

 9            MS. ZUSMAN:  So the case is *United States v. Welborn*,

10    that's 849 F2d 980 at 983, it's Ninth Circuit, 1988, and it says

11    when a Court considers this issue -- which is the dismissal

12    without prejudice and whether or not that can stand -- it must

13    begin with a presumption that the prosecutor acted in good faith.

14            So it's a correct proposition, it's just that specific

15    language is not found in *Wallace*, but it is found in *Welborn*.

16            THE COURT:  What are we to make of the statements in

17    support of this motion to dismiss Count 6 by the government:

18    first, the statement that it had recently identified additional

19    criminal conduct by Mr. Jackson?  First, was that correct?

20            MS. ZUSMAN:  That was -- it was re- -- it depends on

21    how broadly you define "recently."  We learned from --

22            THE COURT:  "Recently" meaning not subsequent to the

23    date that statement was made.

24            MS. ZUSMAN:  That's correct.  What happened was we

25    learned from Minor Victim 4 in February, so about 7 months

1   earlier, that there was another victim, and that was MV5.

2           Now, it took a couple of months to identify MV5 and

3   then it took a couple of more months to identify who Nelly was,

4   but that's the information that we're talking about that's

5   developing between February and September of that year.

6           THE COURT:  Well, did that information support

7   additional criminal conduct by Mr. Jackson as opposed to

8   Miss Petrovic?

9           MS. ZUSMAN:  It did.

10          THE COURT:  MV4 is saying that Mr. Jackson is involved

11  in criminal activity regarding MV5?

12          MS. ZUSMAN:  Yes.

13          THE COURT:  And so you're contending that in those

14  earlier months, that supports the statement made on the day --

15  well, in support of the Rule 48(a) motions.

16          MS. ZUSMAN:  Yes.

17          THE COURT:  And you agree, I assume, that what you

18  learned subsequent to the filing of that motion would not support

19  that statement.

20          MS. ZUSMAN:  Correct.

21          THE COURT:  Same question with regard to proceeding as

22  opposed to dismissing without prejudice being operationally

23  risky.  What's the support for that?

24          MS. ZUSMAN:  The support for that is that, as I

25  understand it, in September, we were just about a month out from

1    trial, and that was the trial involving Keonte Scott as the

2    primary.  I think our primary concern at that time was that we

3    were still gathering new information about MV5.  We just learned

4    the day before that they had contacted her, that they were going

5    to go out and interview her, and that we were in a position where

6    we had a trial date in a month and we were still investigating.

7            So referring to this as being "operationally risky,"

8    it's that gathering information that we know we need to produce,

9    and we only have a month before trial.  So that's my

10   understanding of what that statement meant.

11           THE COURT:  I thought it was advertised as meaning that

12   it would result in threats to MV5.

13           MS. ZUSMAN:  Well, there was that concern as well.  And

14   as I understand it, MV5 also was contacted by associates of

15   Mr. Jackson.

16           THE COURT:  All right.  Thank you.  Well, I should ask,

17   do you agree that if the Rule 48(a) motion was made in bad faith,

18   that the consequence is that there's a violation of the Speedy

19   Trial Act?

20           MS. ZUSMAN:  I'm not prepared to answer that -- the

21   interplay between the Rule 48 issue and the Speedy Trial Act

22   issue if -- but if there were --

23           THE COURT:  In terms of the production -- and that's

24   the only thing we're concerned about today -- you contend that

25   the standard for answering this question is bad faith, therefore,

1     what's your position on whether evidence of bad faith in the

2     seeking of a Rule 48(a) motion to dismiss without prejudice is or

3     isn't producible and relevant to the motion we're going to hear

4     on August 30th?

5            MS. ZUSMAN:  If your question is if we had --

6            THE COURT:  I'm trying to focus not on the -- it's fair

7     enough I'm not asking you to have an argument on the motion to

8     dismiss.  I'm really only trying to get at what must be produced

9     in advance of that hearing.

10           So you contend that the standard that would need to be

11     met is bad faith.  So, therefore, what's your position on whether

12     evidence of bad faith on the 48(a) question must be produced

13     before that hearing to the defense?  "Yes" or "no."  I'm not -- I

14     don't need a one-word answer, but is your position it should or

15     should not be produced?

16           MS. ZUSMAN:  I'm sorry.  Apologies.

17           So if I understand your question -- and so if we had

18     evidence, internal or external, that we moved to dismiss the

19     original indictment in bad faith, would I have to produce it?

20           THE COURT:  Yes.

21           MS. ZUSMAN:  If that's your question, then, again,

22     under a broad reading of the due process clause, I'd say probably

23     yes.

24           My other answer, though, is, of course, we don't have

25     that.  We don't have any evidence of bad faith reasons for

1  dismissal.

2          This case is one that simply grew --

3          THE COURT:  No, no.  I don't need you to argue bad

4  faith yet.

5          MS. ZUSMAN:  Okay.

6          THE COURT:  I'm not going to make any decision about

7  bad faith today at all.  I just need to figure out what needs to

8  be produced.

9          But you have different views about the government's

10  legal standard.  I don't also have to resolve that today.  I

11  haven't heard anything that -- well, you tell me whether -- what

12  you think -- in light of the arguments we've heard, what you

13  think should be produced beyond what you already know to support

14  their Speedy Trial Act motion.

15          MS. HOWES:  Well, having heard for the first time just

16  now new facts that the government is relying on to support their

17  representations made in its motion to dismiss --

18          THE COURT:  What did you hear that was new?  I thought

19  I'd read everything that she said.

20          MS. HOWES:  What I heard just now was that the new --

21  recent discovery of new evidence was in reference to the

22  developing identification of MV5, which took a couple of months,

23  and the developing identification of Mr. Jackson, which took a

24  couple of more months.

25          THE COURT:  Well, we knew the phrase was there, and you

1    thought it referenced something that happened later, and they're

2    saying it references something that happened earlier.  On

3    August 30th, we can debate who's right about that.

4           MS. HOWES:  Well, I mean --

5           THE COURT:  But none of those facts are new.

6           MS. HOWES:  Well, but they're new in that it didn't

7    take a couple of months to do either of those things, that it

8    took a couple of weeks for the government to identify MV5.  And I

9    can refer to the affidavit of Yonsoo Lee on that point, that he

10   had identified her in early February and that they had obviously

11   identified Mr. Jackson prior to his June indictment.  So that was

12   certainly nothing new between his indictment and the argument

13   that the government was making.

14          MS. ZUSMAN:  Your Honor, if I might just interject.  I

15   agree with her on both timing points.  So it was a couple of

16   weeks before we identified MV5 and I believe it was -- I do think

17   it was a couple of months before we identified Jackson, but it's

18   all part of what we were learning.

19          THE COURT:  Well, I understood your argument to be such

20   that the delays meant that you learned things after you

21   originally indicted him that would support something else

22   happening, further investigation.

23          If you learned all of it before you originally indicted

24   him, then after that original indictment, it would be tough to

25   rely on that to say, "We've recently learned additional

1    information."  The clear implication of that is, "since we last

2    indicted him."

3              Is any of this in your argument --

4              MS. ZUSMAN:  Yes.  And I apologize.

5              THE COURT:  -- something you learned after the first

6    indictment?

7              MS. ZUSMAN:  If we're focusing on after the first

8    indictment before the motion to dismiss, that would be finding

9    MV5 and setting up the interview with her.

10             THE COURT:  All right.  I want to turn to your third

11   argument.  So your contention is unconstitutional delay not

12   grounded in a technical violation of the Speedy Trial Act, but

13   unconstitutional delay across the whole span of initially

14   starting the case through the second indictment.

15             MS. HOWES:  That's right.  And there are different

16   standards that apply when considering pre-indictment delay versus

17   post-indictment delay.

18             THE COURT:  And you're alleging post-indictment?

19             MS. HOWES:  I'm alleging both.

20             THE COURT:  Well, you're alleging both.  Yeah.  You're

21   alleging both, before the first indictment and after the first

22   indictment.

23             MS. HOWES:  That's right.

24             THE COURT:  I think I know the governing standards.

25   And you're relying essentially on what you view as knowing what

1  they needed to know and not moving on it for the post-indictment
2  delay, right?

3         MS. HOWES:  That is right.  And as I read the *Barker*
4  standard for post-indictment delay, I don't even need to show
5  prejudice, and that argument can be based merely on government
6  negligence.  So I don't need to show government bad faith there.

7         THE COURT:  So in light of that position -- again,
8  we're just here today on your motion to compel -- what else do
9  you think you need to argue that motion on the 30th?

10         MS. HOWES:  Well, I think that the arguments -- or
11  sorry.  The discovery of internal communications about what steps
12  were taken with respect to MV5's interview, locating her, and
13  determinations as to what steps need to be taken as to securing
14  her cellphone evidence are all relevant to that, because the
15  Court's task is to determine, again, the degree of the
16  government's responsibility for the delay and the degree of
17  prejudice.  Those are factors that play with one another.

18         And so if there is actual prejudice that the government
19  caused through negligent conduct, that might weigh in favor of a
20  dismissal, or if there's no prejudice but the government acted
21  egregiously or in bad faith, that also might warrant dismissal.

22         So I think in order for the Court to make an
23  intelligent decision about how to balance those factors, the
24  Court and the defense ought to have the information necessary to
25  consider the government's responsibility for the delay and the

1       attendant loss of evidence.

2                   THE COURT:   Thank you.

3                   I'm going to short-circuit this a little bit.  I am

4       going to order the government to produce to the Court for

5       in camera review its file in this case, or certainly a copy of

6       its file.  Electronic version will be fine.  You don't have to

7       copy it all off.  And I will undertake an independent review in

8       light of my understanding of what the government -- excuse me,

9       the defense needs to argue its motions on August 30th.

10                  They're interrelated, and so I'm not going to parse out

11      one versus the other for production to me.  In other words, one

12      of them standing alone might require only a few files, but

13      they're all interrelated enough that I'm just going to ask the

14      entire case file to be forwarded.

15                  For starters today, of course, my only interest is what

16      needs to be produced in order to adequately handle for all sides

17      the August 30th hearing.  So I need it produced quickly so that I

18      can review it quickly so they can be produced in time to prepare

19      for that hearing.

20                  In doing so, of course, I will necessarily have

21      reviewed for trial purposes *Brady* disclosures, and so I'll handle

22      that at -- I'll discuss that with the parties as necessary at the

23      August 30th hearing.  In other words, I'll review -- I'll decide

24      well in advance of the hearing what needs to be produced, if

25      anything, to prepare for the hearing.

1       If there's something that's not necessary for the

2  hearing but will be important at trial, I'll discuss that with

3  the parties at the August 30th hearing.

4       How quickly can that be produced for in camera review?

5       MS. ZUSMAN:  If I may confer.

6       (Pause in proceedings)

7       MS. ZUSMAN:  Your Honor, if I may, clarification:  Do

8  you want to see the 11 volumes of discovery we have produced or

9  do you just want everything internal that we haven't produced?

10       THE COURT:  I don't need to see anything you've already

11  produced.

12       (Pause in proceedings)

13       MS. ZUSMAN:  Your Honor, we believe we can put that

14  together in a week.

15       THE COURT:  All right.  That'll be fine.  And I'll get

16  an answer as soon after that as I can.

17       The parties have generally briefed the August 30th

18  motions already.  You have today and may have other authorities

19  you want me to consider.  Please do that by letter brief well in

20  advance of the hearing so I can, you know, assimilate what you

21  want me to understand.

22       There are two things that I -- well, one thing that I

23  will certainly focus on at the hearing, which I tried to start

24  doing today.  I'll want to understand what you intend the test is

25  for the motion that you're bringing, whose burden is it and whose

1   got to satisfy what test. So don't just jump right in to the

2   facts without getting the methodology down.

3        And then second, it's been phrased as a bimodal

4   question, dismissal or not, but, of course, for a variety of

5   these motions, there are other remedies that the case law

6   discusses, and I want you to be prepared to discuss those,

7   permissive and mandatory inference instructions, for example,

8   which is what at least the Arizona court did in *Youngblood*

9   itself, you know. Now, that's not to say the Supreme Court

10   affirmed that, but that's not an uncommon remedy, so I want to

11   look at those as well.

12        Anything further, then, from the movant today, for the

13   defense?

14        MS. HOWES: Your Honor, the other request we had of the

15   Court was to allow the defense to take the testimony of

16   Department employees at the motion to dismiss hearing. We have

17   provided the government with a Touhy letter under the applicable

18   CFR, and have been informed that the government objects to our

19   taking the testimony of any Department employees.

20        I would suggest if --

21        THE COURT: Who were you thinking of?

22        MS. HOWES: We wanted to take the testimony of former

23   AUSA Jennifer Martin, AUSA Tom -- Thomas Ratcliffe, and the two

24   TFOs who were involved in the investigation, Angela Hollan and

25   Yonsoo Lee.

1          It may be that with the production of materials after

2     the Court's in camera review, we can narrow that request or be

3     more specific in that request, and it may make sense to punt that

4     issue to a later time, but that is something that is on our

5     plate.

6          THE COURT:  We'll just take that up on the day of.

7     There's a method for resolving questions about Touhy litigation,

8     and we'll just do it on that day.

9          Anything further for the United States?

10     MS. ZUSMAN:  No, Your Honor.

11     THE COURT:  Thank you.  We'll be in recess.

12     (Proceedings concluded at 11:34 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3              I certify, by signing below, that the foregoing is a

 4   true and correct transcript of the record, taken by stenographic

 5   means, of the proceedings in the above-entitled cause.

 6              A transcript without an original signature, conformed

 7   signature, or digitally-signed signature is not certified.

 8

 9       DATED this 26th day of July, 2021.

10

11

12                              /s/ Kellie M. Humiston

13                              Kellie M. Humiston, RMR, CRR
                                Official Court Reporter
14                              Certificates Expire:  9/2021

15

16

17

18

19

20

21

22

23

24

25
```